FILED

2012 Mar-26  PM 02:05
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **DERICK COX,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:11-cv-411-AKK** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Derick Cox ("Plaintiff") brings this action pursuant to Section

205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review

of the final adverse decision of the Commissioner of the Social Security

Administration ("SSA").  This court finds that the Administrative Law Judge's

("ALJ") decision - which has become the decision of the Commissioner - is

supported by substantial evidence.  Therefore, for the reasons elaborated herein,

the Court will **AFFIRM** the decision denying benefits.

### I. Procedural History

Plaintiff filed his application for Title II disability insurance benefits and

Title XVI Supplemental Security Income ("SSI")[1] on February 16, 2007, alleging a disability onset date of March 31, 2004, (R. 168), due to "mental problems" and "problems with my back," (R. 192).  Plaintiff's disability report alleged also that he is unable to work because he "suffer[s] from schizophrenia.  I see and hear things.  I am suicidal.  I have difficulty concentrating and sleeping." (R. 192). After the SSA denied his applications on April 26, 2007, (R. 84), Plaintiff requested a hearing on May 22, 2007, (R. 95), and received one on January 12, 2009, (R. 40), where the ALJ ordered a post-hearing mental status exam, (R. 62). Plaintiff received a supplemental hearing on July 9, 2009, (R. 66), during which the ALJ ordered a post-hearing IQ test and personality inventory, (R. 75).  At the time of the hearings, Plaintiff was 45 years old, (R. 46), had a high school certificate of attendance, (R. 52), and past relevant work that included light and medium and unskilled work as a dishwasher, medium to heavy and unskilled work as a construction laborer, and medium and unskilled work as an auto body repair helper, (R. 77).  Plaintiff has not engaged in substantial gainful activity since March 31, 2004.  (R. 8, 168).

-------

[1]The Act requires a plaintiff to show entitlement to disability insurance benefits before the expiration of the plaintiff's insured status.  *See* 42 U.S.C. § 404.131(a).  Plaintiff's disability insured status expired on March 31, 2004, (R. 8, 180), and virtually all of Plaintiff's medical records are dated subsequent to that date.  However, because this provision does not apply to SSI, and because this court is affirming the ALJ's decision, this court declines to consider whether Plaintiff has sufficient evidence to establish disability insurance benefits prior to March 31, 2004.

The ALJ denied Plaintiff's claims on August 21, 2009, (R. 4), which became the final decision of the Commissioner when the Appeals Council refused to grant review on September 30, 2010, (R. 1). Plaintiff then filed this action pursuant to section 1631 of the Act, 42 U.S.C. § 1383(c)(3). Doc. 1.

## II. Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence." *See id*. (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person

would accept as adequate to support a conclusion." *Martin*, 849 F.2d at 1529

(quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by

substantial evidence, the court must affirm the Commissioner's factual findings

even if the preponderance of the evidence is against the Commissioner's findings.

*See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review

of the ALJ's findings is limited in scope, it notes that the review "does not yield

automatic affirmance."  *Lamb*, 847 F.2d at 701.

### III.  Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairments which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or

psychological abnormalities which are demonstrated by medically acceptable

clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis.

20 C.F.R. § 404.1520(a)-(f).  Specifically, the Commissioner must determine in

sequence:

(1)   whether the claimant is currently unemployed;

(2)   whether the claimant has a severe impairment;

(3)   whether the impairment meets or equals one listed by the Secretary;

(4)   whether the claimant is unable to perform his or her past work; and

(5)   whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *Id*. at 1030 (citing 20 C.F.R. § 416.920(a)-(f)). "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

## IV. The ALJ's Decision

The court turns now to the ALJ's decision to ascertain whether Plaintiff is correct that the ALJ committed reversible error. In that regard, the court notes that, performing the five step analysis, initially, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date, and therefore met Step One. (R. 8). Next, the ALJ acknowledged that Plaintiff's

severe impairments of "status post left forearm fracture, back pain, history of

polysubstance abuse, history of posttraumatic stress disorder, depression/

dysthymia, antisocial personality disorder, and borderline intellectual functioning"

met Step Two. *Id*. The ALJ then proceeded to the next step and found that

Plaintiff did not satisfy Step Three since he "does not have an impairment or

combination of impairments that meets or medically equals one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. [§§]

404.1520(d), 404.1525, 404.1526, 416.925 and 416.926." (R. 10). In this regard,

the ALJ found also that

> [Plaintiff] does not meet the criteria of this listing [12.05] because he
> does not have significantly subaverage general intellectual
> functioning with deficits in adaptive functioning initially manifested
> during the developmental period. Dr. Neville reported in April 2007
> and again in April 2009 that [Plaintiff] appeared to function in the
> borderline range intellectually. [Plaintiff's] work history and his
> activities are not consistent with mental retardation with deficits in
> adaptive functioning. No school records have been submitted to
> corroborate the allegations of [Plaintiff] and his mother of a history of
> special education and of repeated grades and functional illiteracy. Dr.
> Neville's opinion that [Plaintiff] functioned in the borderline range
> intellectually is more consistent with the record as a whole than is Dr.
> Blotcky's opinion that [Plaintiff] functioned in the mildly mentally
> retarded range.
>
> * * * *
>
> Dr. Blotcky's opinion in July 2009 that [Plaintiff] had marked to
> extreme mental limitations is inconsistent with all of the other
> evidence of record and is entitled to little weight. Dr. Blotcky
> apparently based his opinion on [Plaintiff's] subjective complaints,

which are not credible.

(R. 11, 12).  Although the ALJ answered Step Three in the negative, consistent

with the law, *see McDaniel*, 800 F.2d at 1030, the ALJ proceeded to Step Four,

where he determined that Plaintiff

> has the residual functional capacity ["RFC"] to perform light work as
> defined in 20 C.F.R. 404.1567(b) and 416.967(b), which allows for
> lifting 20 pounds, sitting six of eight hours, standing and walking six
> of eight hours, no operation of motor vehicles as a part of job duties,
> non complex job tasks, dealing mainly with objects and not people,
> and contact with the general public and coworkers that is brief,
> infrequent, and casual.

(R. 11).  In light of Plaintiff's RFC, the ALJ held that Plaintiff was "unable to

perform any past relevant work."  (R. 13).  The ALJ then moved on to Step Five

where he considered Plaintiff's age, education, work experience, and RFC, and

determined that there are "jobs that exist in significant numbers in the national

economy that [Plaintiff] can perform."  (R. 13).  As a result, the ALJ answered

Step Five in the negative, and determined that Plaintiff is not disabled.  (R. 18);

*see also McDaniel*, 800 F.2d at 1030.  It is this finding that Plaintiff challenges in

this action.

## V.  Analysis

Plaintiff contends that the ALJ committed reversible error when he "chose

to unilaterally discount the applicability of Listing 12.05 because Plaintiff does not

have significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period."  Doc. 8 at 12.  Specifically, Plaintiff contends that the ALJ should have accepted Dr. Alan Blotcky's ("Dr. Blotcky") mental retardation diagnosis because case law establishes that "evidence of low IQ test scores after age 22 [ ] create[s] a rebuttable presumption of a fairly constant IQ throughout life."  Doc. 8 at 13. Likewise, Plaintiff contends the ALJ should have recalled "[Dr. John Goff] for his comments and clarification" on Dr. Blotcky's assessment, and that the Appeals Council "erred in failing to allow the claim or remand for this development. " *Id*. at 14.  Based on its review of the record, the court finds that the ALJ's decision that Plaintiff does not meet Listing 12.05 is supported by substantial evidence.

Listing 12.05(C) requires a plaintiff to have (1) "significantly subaverage general intellectual functioning with deficits in adaptive functioning" manifested before age 22, (2) a "valid verbal, performance, or full scale IQ of 60 through 70," and (3) a "physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. pt. 404, subpt. P., app. 1, § 12.05.  "Absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly constant IQ throughout [ ] life." *Hodges v. Barnhart*, 276 F.3d 1265, 1268 (11th Cir. 2001).  Therefore, the

absence of an IQ test before age 22 in itself will not preclude a finding of mental retardation.

The court notes that Plaintiff's only evidence of subaverage intelligence with deficits in adaptive functioning before age 22 are his and his mother's anecdotes that Plaintiff repeated grades, his purported placement in special education classes,[2] and that he only finished twelfth grade with a certificate of attendance.  (R. 46, 47, 410).  Since Plaintiff does not have an IQ test to submit as proof of subaverage intelligence with deficits before age 22, Plaintiff's disability claim rests exclusively on Dr. Blotcky's July 28, 2009, evaluation, which Plaintiff asserts establishes a rebuttable presumption that Plaintiff meets the requirements of Listing 12.05.  As shown below, Dr. Blotcky's evaluation is inconsistent with the record as a whole and the ALJ's opinion to discount it is supported by substantial evidence.

The court will start its review of the medical record with Dr. Blotcky's evaluation.  The record shows that Dr. Blotcky conducted a single evaluation of Plaintiff and reported that Plaintiff "was motivated during the exam," "demonstrated logical and orderly thinking," had thought processes that were

---

[2]As the ALJ pointed out, Plaintiff failed to produce any school records to support his contention that he was placed in special education classes.  (R. 11).

"extremely concrete and simplistic," but that his "abstract thinking was poor," and that he "seemed sad and anxious." (R. 432). Dr. Blotcky administered the Wechsler Adult Intelligence Scale Third Edition ("WAIS-III"), and Plaintiff scored 62, 50, and 58 on the verbal, performance, and full scale portions, respectively, which Dr. Blotcky found "place[d] [Plaintiff] in the Mildly Retarded range of intellectual abilities." *Id*. Also, Plaintiff scored a 39 on the Beck Depression Inventory, which, according to Dr. Blotcky, indicated the "presence of severe depression." (R. 433). Consequently, Dr. Blotcky diagnosed Plaintiff with (1) major depressive disorder, recurrent, severe with psychosis, (2) alcohol abuse (in remission, by history), (3) cocaine abuse (in remission, by history), (4) mild mental retardation, and (5) antisocial personality disorder. (R. 433). Moreover, Dr. Blotcky noted that Plaintiff had marked restrictions in activities of daily living and, in the ability to respond appropriately to supervision and co-workers and perform simple tasks in a work place setting. (R. 435-36). Furthermore, Dr. Blotcky opined that Plaintiff had extreme restrictions in concentration, persistence and pace, and extreme restrictions in the ability to respond to customary work place pressures and carry out and remember instructions in a work place setting. (R. 435). Lastly, Dr. Blotcky reported that Plaintiff's prognosis was "extremely poor because of the combination of a serious affective illness, antisocial

personality disorder, and mental retardation."  (R. 434).

In light of Plaintiff's contention that the ALJ erred by giving "little weight" to Dr. Blotcky's evaluation, the court turns next to the rest of Plaintiff's medical records to see if they are consistent with Dr. Blotcky's assessment.  In that regard, as it relates to this claim, Plaintiff's medical history began during his incarceration at Kilby Correctional Facility ("Kilby") where, on March 9, 2004, Plaintiff's initial Mental Health Services screening noted that Plaintiff (1) had not received psychotropic medication prior to his incarceration, (2) had no history of suicidal attempts or thoughts, (3) had a history of substance abuse and treatment, and (4) had not attended special education class.[3]  (R. 273).  Thereafter, Plaintiff underwent regular evaluations throughout his incarceration:

- May 20, 2004 - mental health referral form noted "possible mild [mental retardation]," and that Plaintiff was withdrawn and depressed because of "family members dying and wanting to go home."  (R. 271).

- March 29, 2005 - Kilby referred Plaintiff for mental health services when Plaintiff reported schizophrenic symptoms and audio-visual hallucinations. (R. 269).

- March 30, 2005 - Plaintiff's psychiatric evaluation noted that he was "alert, well oriented, appropriated" and "stable in mood," and that although Plaintiff reported cutting his wrist three years ago, he did not currently have any suicidal thoughts.  (R. 253).  The psychiatrist prescribed Plaintiff the

---

[3]Plaintiff's report to Kilby that he never attended special education is in direct contradiction to Plaintiff's representations to the SSA and this court.

antidepressant, Geodon.  (R. 253).

• April 29, 2005 - Plaintiff's psychiatric evaluation noted that he was alert and cooperative, but that he reported hearing "voices." (R. 245).  The psychiatrist diagnosed Plaintiff with schizophrenia, and discontinued the Geodon and prescribed Triavil, another antidepressant, and Benadryl. *Id.*

• June 9, 2005 - Plaintiff reported that the "Triavil works well," "but I think I need it twice a day." (R. 244).  The physician noted that Plaintiff was alert and cooperative and reported no hallucinations or other psychosis. *Id*.

• July 6, 2005 - Plaintiff reported that he was "doing pretty good," and the examining physician continued his current drug regimen.  (R. 243).

• August 1, 2005 - Plaintiff reported being "too sleepy" and the examining physician discontinued Benadryl and decreased the Triavil.  (R. 242).

• August 16, 2005 -  Plaintiff reported that he liked Geodon better than Triavil, but the examining physician continued his Triavil therapy.  (R. 241).

• November 21, 2005 - Plaintiff reported "doing fine" and denied suicidal or homicidal tendencies, and was diagnosed with psychoses/substance abuse. (R. 239).

• December 19, 2005 and March 14, 2006 - Plaintiff reported doing well and sleeping well.  (R. 237-238).

• May 4, 2006 - Plaintiff reported increased hallucinations and paranoia and the examining physician discontinued the Triavil, and diagnosed Plaintiff again with psychosis secondary to substance abuse.  (R. 236).

• May 18, 2006 - Plaintiff reported that it was "hard to get to sleep - anxiety," (R. 25), but a month later, on June 14, 2006, reported doing fine and having no suicidal or homicidal thoughts, (R. 234).

• July 14, 2006 - Plaintiff reported that he was "a lot more depressed," and the

examining physician prescribed the antidepressant, Prozac.  (R. 233).

- August 30, 2006 - Plaintiff reported that he was "still depressed and not getting any rest," and, as a result, the physician increased Plaintiff's Prozac dosage.  (R. 232).

- November 21, 2006 - Plaintiff reported that he was "not depressed, still itching and [getting] poor sleep." (R 230).  As a result, the examining physician again prescribed Benadryl.  *Id*.

- December 14, 2006 - Plaintiff reported that he "want[s] to get back on the Triavil - I was doing better on it," but the examining physician continued treating Plaintiff with Benadryl and Prozac.  (R. 229).

The Kilby medical records are particularly insightful and relevant because they contain Plaintiff's most substantive and consistent psychiatric evaluations. Significantly, the Kilby physicians evaluated Plaintiff from May 2004 through December 2006 and diagnosed him with psychosis secondary to substance abuse, (R. 236), schizophrenia, (R. 243), depression, (R. 230), and dysthymia, (R. 232), but never opined that Plaintiff was mildly mentally retarded.  In fact, Kilby completed the May 20, 2004, referral to mental health form that noted that Plaintiff has "possible mild [mental retardation]" <u>before</u> a physician evaluated Plaintiff.  (R. 271).  Moreover, on March 30, 2005, Plaintiff's global assessment of functioning[4] ("GAF") score was 60-65, (R. 253), which indicated mild symptoms

---

[4]The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000), presents the Global Assessment of Functioning ("GAF") Scales, which is widely used to score the severity of psychiatric illnesses.

in social, work, and school functioning, but fell short of even mild mental

retardation.  Furthermore, Plaintiff's ability to participate in his psychiatric care

while at Kilby suggested no history of suffering from mild mental retardation.

Indeed, Plaintiff reported when his medications worked, when they made him too

sleepy, or when he wanted to return to a prior drug, and accordingly, made

recommendations to physicians to adjust his medications based on his side effects

or other preferences.  In short, the Kilby record does not support Dr. Blotcky's

assessment that Plaintiff is mildly mentally retarded.

The next physician to evaluate Plaintiff was Dr. Standford Williamson ("Dr.

Williamson"), who completed a consultative examination on April 14, 2007.  (R.

298).  Dr. Williamson noted that Plaintiff reported suffering from schizophrenia,

that Plaintiff had not had any medication since his release from prison and, as a

result, was again hallucinating, and that Plaintiff's mother reported also that

Plaintiff suffers from insomnia.  *Id*.  Dr. Williamson diagnosed Plaintiff with

"mental illness with symptoms of schizophrenia and insomnia."  (R. 300).

Although Dr. Williamson evaluated Plaintiff only once, and, therefore, has limited

value, the evaluation does not support Plaintiff's contention that he qualified for

Listing 12.05.

Two days later, Dr. Cynthia Neville ("Dr. Neville") also completed a

psychological evaluation and noted that Plaintiff reported that he "experiences

daily visual hallucinations, feels depressed, and finds it difficult to concentrate and

sleep." (R. 303). Plaintiff's mother reported that "she believed that he repeated

the third grade before qualifying for Special Education services in either the fourth

or fifth grade due to 'learning problems.'" *Id.* Regarding substance abuse,

Plaintiff reported that he "smokes a half pack of cigarettes each day despite his

diagnosed asthma but does not consume alcohol," and denied a history of

substance abuse even though he admitted completing substance abuse classes

while at Kilby. *Id.* Significantly, Dr. Neville noted that Plaintiff

> was minimally cooperative, frequently asserting that he did not know
> answers to questions about his past or providing vague, evasive
> responses. The undersigned clinician reminded [Plaintiff] repeatedly
> that [his] apparent lack of effort and suspected pattern of providing
> incorrect answers purposely would be reported to DDS and could
> negatively impact his application. [Plaintiff] was judged to be
> malingering in an unsophisticated manner in his descriptions of his
> hallucinations as well as throughout much of the formal mental status
> examination. For example, [Plaintiff] suggested that 2+2=9, but
> when confronted by the examiner about [Plaintiff's] clear tendency to
> provide incorrect answers to simple questions, [Plaintiff] corrected
> himself and stated, "4."

(R. 304). Dr. Neville determined that Plaintiff was "unlikely to improve over the

next 12 months," noted that Plaintiff's "effort was poor and his answers were

suspect much of the time," and diagnosed Plaintiff with malingering, dysthymic

disorder (by history), nicotine dependence, antisocial traits, and borderline

intellectual functioning (provisional).  (R. 305-306).  This assessment has limited

value alone, in part, because Dr. Neville found that Plaintiff malingered.  (R. 302-

306).  This statement is, however, consistent with medical expert Dr. John Goff's

("Dr. Goff") opinion that he did not "think anybody who has examined [Plaintiff]

really buys into the auditory and visual hallucinations."  (R. 75).

Two years later, on April 6, 2009, Dr. Neville again completed a Medical

Source Statement and Psychological Evaluation on Plaintiff and noted that

Plaintiff reported seeing things and people at night and hearing voices, but could

not provide great detail about the alleged hallucinations.  (R. 409).  When Dr.

Neville asked Plaintiff why he applied for disability benefits, Plaintiff replied, "I

forget a lot."  (R. 409).  Plaintiff admitted being incarcerated on and off for 20

years and that he was not currently taking medication.  (R. 409, 410).  Regarding

his adaptive functioning prior to age 22, Plaintiff stated that he "was suspended

from school repeatedly for fighting and continues to find it difficult to get along

with others," but declined to state whether he had repeated a grade or qualified for

special education classes.  (R. 410).  Plaintiff reported that he bathed, dressed, and

groomed himself, and that he no longer had a driver's license because "[t]hey took

it, I guess, due to my accident."  (R. 413).  Dr. Neville also found that Plaintiff

"suggested that he is troubled by memory limitations, but his descriptions of these

issues seemed more accurately to reflect concentration problems." (R. 412). According to Dr. Neville's report, Plaintiff was "minimally cooperative and demonstrated poor effort." (R. 411).

Dr. Neville diagnosed Plaintiff with cocaine and alcohol abuse, dysthymic disorder - late onset, post traumatic stress disorder, antisocial traits, and borderline intellectual functioning. (R. 413). Regarding Plaintiff's prognosis, Dr. Neville estimated that Plaintiff's "mild symptoms of agitated depression might improve if he were to engage consistently in outpatient psychotherapy and psychiatric medication management." *Id*. Significantly, Dr. Neville noted that, after reviewing the records, Plaintiff's

> ability to understand, remember, and follow through with work instructions would likely be limited to a mild to moderate degree. His ability to interact appropriately with coworkers and supervisors would likely be negatively impacted by his antisocial tendencies to a moderate degree with his ability to handle typical work pressures might be negatively impacted by his symptoms of agitated depression to a mild degree.

(R. 413). Lastly, Dr. Neville found that Plaintiff has "moderately below average intellectual abilities and to be suffering from mild symptoms of agitated depression." (R. 406).

Unfortunately for Plaintiff, consistent with the Kilby medical file, Dr. Neville's assessment does not indicate that Plaintiff is mildly mentally retarded.

Instead, this record demonstrates that Plaintiff has below average intellectual abilities and suffers from depression, post traumatic stress disorder, and antisocial behaviors. Although Plaintiff's depression, post traumatic stress disorder, and antisocial behaviors are serious medical conditions, they are conditions that a drug and psychotherapy regimen could potentially improve. *See* R. 413. Moreover, the moderate restrictions Dr. Neville noted are consistent with Plaintiff's substantial relevant work history. Significantly, Dr. Neville's assessment is consistent with Plaintiff's diagnoses at Kilby and with the record as a whole.

The court turns next to Plaintiff's treatment at the Western Mental Health Center ("the Center"). Plaintiff first visited the Center on April 27, 2007, after Plaintiff's "application for treatment [at the Center] was initiated by his previous treatment staff [Kilby]. Preliminary information suggest[ed] that [Plaintiff] may benefit from treatment for a psychotic disorder." (R. 342). The initial assessment noted that Plaintiff reported hearing voices, "has paranoid delusions," poor sleep, and symptoms of depression, although he appeared "calm and in no acute distress, but appears dysphoric and has difficulty responding to direct questions." Two weeks after the intake, on May 9, 2007,[5] Plaintiff returned to the Center and met

---

[5]On May 2, 2007, Dr. Glasser noted that "[Plaintiff postpone[d] decision regarding admission. [Plaintiff] called to reschedule." (R. 341). On May 7, 2007, Dr. Glasser noted that Dr. Glasser "postpone[d] decision regarding admission" and that the "center reschedul[ed] app[ointment] 5/9/07." (R. 340).

with Dr. William Glasser ("Dr. Glasser"), who evaluated Plaintiff and noted that

Plaintiff reported that he needed medication because he heard voices, saw things,

and could not sleep.  (R. 338). Significantly, Dr. Glasser noted that he did not "see

any behavior that would suggest [hallucinations].  His behavior in general is

congruous," (R. 338), assessed Plaintiff's GAF score as 57, and diagnosed

Plaintiff with chronic post traumatic stress disorder, adjustment disorder with

mixed anxiety and depression, adult antisocial behavior, and anxiety and

depression, apparently due to "long [years] of incarceration," (R. 339).  Dr.

Glasser scheduled Plaintiff to return on July 16, 2007.  (R. 337).[6]

Two months later, on July 16, 2007, Dr. Glasser evaluated Plaintiff again

and noted the following:

> [Plaintiff reported,] 'I still ain't gettin' no sleep and I be hearin'
> voices that tell me I'm stupid.'  He claims this occurs only at night
> usually after 10 pm, and somehow he's gotten the idea that the whole
> world is out to get him.  He reports that he has gaps in his memory,
> and that his family has to go find him after he's been gone weeks at a
> time.  He denies drinking alcohol, but can't be sure as he can't
> remember.  He claims to be [drug] free at this moment.  He says he is
> fully compliant with med[ications].  He is not in acute distress, but is
> disspirited and dysphoric. [ ] Need to reschedule 6-8 weeks with me.

(R. 334).  Three days later, Dr. Glasser noted

_____

[6]On May 23, 2007, Plaintiff saw a clinician at the Center and signed a Person Centered
Treatment Planning Element.  (R. 336).

> [Plaintiff] was placed on waiting list for [University of Alabama at
> Birmingham's Center for Psychiatric Medicine] on 7/17/07, bed
> secured on 7/18/07, client informed and said his Mom would have
> him there by 6 or 7 pm, records faxed to Dr. Lavine.  Access called
> 7/19/07 and reported that [Plaintiff] did not show.  Reached Step Dad
> by phone on 7/19/07, he said [Plaintiff] had not told them about the
> admission, Mom at work, Step Dad did not know Derick's
> whereabouts.  They are to call if he shows up but bed will probably be
> gone by then.

(R. 333).  Dr. Glasser did not see Plaintiff again and noted on September 11, 2007,

that Plaintiff "has failed to return," (R. 331), and that he has "not been able to

contact [Plaintiff] since he was arrested in late July," (R. 332).  Dr. Glasser's

diagnoses are consistent with Dr. Neville's and the Kilby physicians.

Ultimately, Plaintiff's entire disability claim rests on Dr. Blotcky's

assessment that Plaintiff is "mildly retarded."  Unfortunately for Plaintiff, Dr.

Blotcky's findings are not supported by substantial evidence.  In fact, Plaintiff's

past relevant work as a dishwasher, laborer, and auto body shop helper, (R. 53),

contradict Dr. Blotcky's finding of mild mental retardation.  There is no indication

in the record that Plaintiff quit or was discharged from his jobs because of mental

or physical impairments.  To the contrary, Plaintiff has a sustained history of

relevant work, further undermining Dr. Blotcky's assessment of mild mental

retardation.  Moreover, Dr. Blotcky's report contains internal inconsistencies.  For

example, Dr. Blotcky reported that Plaintiff's daily activities included spending

time "doing light housework, taking short walks, and going to church," and "occasionally visits family members and one friend at home." (R. 432). This is consistent with Plaintiff's reports that he is able to bathe, groom, and dress himself, can prepare simply meals, shop, and run the washing machine, (R. 413), and his ability to work as a dishwasher, laborer, and auto body shop helper, (R. 53, 193). Despite this overwhelming evidence, Dr. Blotcky reported nonetheless that Plaintiff had "marked" restrictions of activities of daily living, (R. 435), a finding which the record simply does not support. Likewise, the record does not support Dr. Blotcky's assessment that Plaintiff would have marked difficulties performing simple tasks in a work setting and extreme difficulties understanding and remembering instructions in a work setting. (R. 436). In fact, Dr. Blotcky remarked that Plaintiff demonstrated "logical and orderly thinking" and that his "thought processes were extremely concrete and simplistic." (R. 432).

Furthermore, the record does not support Dr. Blotcky's finding that Plaintiff has a poor prognosis. (R. 434). In fact, Plaintiff's drug regimen during his incarceration proved effective and Plaintiff reported that he was "doing pretty good," "doing fine," "not depressed," and that he responded better to Triavil. (R. 229, 230, 239, 243). Indeed, Dr. Neville opined that Plaintiff's depression "might improve" if Plaintiff complied with his psychotherapy and drug regimen. (R. 413).

Also troubling is that there is no indication that Dr. Blotcky reviewed Plaintiff's disability medical records and incorporated them into his findings. Conversely, Dr. Neville reviewed Plaintiff's medical records and even made reference to Dr. Glasser's findings. (R. 410). Further, although the evaluation asked, "Will these levels of severity apply without consideration of substance abuse?" (R. 436), Dr. Blotcky failed to respond despite Plaintiff's diagnoses of psychosis secondary to substance abuse, and history of cocaine and alcohol abuse. Lastly, the court notes that Dr. Blotcky provided no substantiation for some of his findings. For example, Dr. Blotcky opined that Plaintiff's "verbalizations were morbid in content," and that his "judgment is deficient," but provided no examples to support those findings. In short, the medical evidence, including Dr. Blotcky's own findings, does not support Dr. Blotcky's finding that Plaintiff has mild mental retardation.

Finally, Plaintiff asserts that "if the ALJ was not satisfied as to the validity of the IQ testing," the ALJ "should have recalled [Dr. Goff, the medical expert] for his comments and clarification." (Doc. 8 at 14). However, this contention rings hollow because, as stated earlier, Dr. Blotcky's findings are not supported by substantial evidence. Therefore, the court finds that the ALJ committed not reversible error by failing to seek Dr. Goff's opinion regarding Dr. Blotcky's findings, which are unsubstantiated and inconsistent with the record as a whole.

Moreover, as the ALJ pointed out, Plaintiff failed to produce any school records to support his alleged placement in special education classes,  (R. 11), and Plaintiff's attempt to subvert his unsubstantiated assertions to the ALJ that he is mildly mentally retarded is unpersuasive.  Having failed to produce this critical evidence, Plaintiff simply cannot credibly claim that the ALJ erred by failing to direct Dr. Goff to clarify the issue of his alleged subaverage intelligence, a matter for which the burden rests with Plaintiff.  *See* 20 C.F.R. § 416.912(a).

When the record is reviewed as a whole, including the deficiencies in Dr. Blotcky's report, this court agrees with the ALJ that Dr. Blotcky's opinion is inconsistent with the record as a whole and cannot sustain a finding that Plaintiff meets Listing 12.05.  Because the record contains substantial medical evidence that Plaintiff is not otherwise disabled, the court finds that the ALJ did not err in failing to solicit Dr. Goff's opinion for "clarification" of Dr. Blotcky's opinion, and the Appeals Council did not err in failing to remand this case for further development of the record.

## VI.  CONCLUSION

Based on the foregoing, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence, and that the ALJ applied proper legal standards in reaching this determination.  Therefore, the

Commissioner's final decision is **AFFIRMED**.  A separate order in accordance

with the memorandum of decision will be entered.

Done the 26th day of March, 2012.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE